David Keanu Sai
47-605 Puapoo Place
Kaneohe, HI 96744
Telephone: (808) 383-6100

**ORIGINAL**

**FILED**

JUN - 1 2010

Clerk, U.S District & Bankruptcy
Courts for the District of Columbia

In *Pro Se*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DAVID KEANU SAI,

               Plaintiff

vs.

BARACK HUSSEIN
OBAMA, HILLARY
DIANE RODHAM
CLINTON, ROBERT
MICHAEL GATES,
ROBERT F. WILLARD, &
LINDA LINGLE

               Defendants.

CIVIL ACTION NO. _____

Case: 1:10-cv-00899
Assigned To : Kollar-Kotelly, Colleen
Assign. Date : 6/1/2010
Description: Pro Se Gen. Civil

## COMPLAINT FOR DECLARATARY, INJUNCTIVE AND OTHER EQUITABLE
## RELIEF

### PRELIMINARY STATEMENT

1. This lawsuit alleges the violation of an executive agreement entered into between
   Queen Lili`uokalani of the Hawaiian Kingdom and President Grover Cleveland of the
   United States in 1893, whereby Hawaiian executive power was temporarily and
   conditionally assigned to the President to administer Hawaiian Kingdom law in the
   Hawaiian Islands. This executive agreement, known as the *Lili`uokalani assignment*

(January 17, 1893), was assigned under threat of war, and binds President Cleveland's successors in office in the administration of Hawaiian Kingdom law until such time as the Hawaiian Kingdom government has been restored pursuant to a second executive agreement, known as the *Agreement of restoration* (December 18, 1893), whereupon the executive power would be returned and the Queen would grant amnesty to those individuals who participated or supported the insurrection.

2. In *U.S. v. Belmont*, 301 U.S. 324, 330 (1937), the Court stated, "Plainly, the external powers of the United States are to be exercised without regard to state laws or policies," and in "respect of all international negotiations and compacts, and in respect of our foreign relations generally, state lines disappear. As to such purposes, the State of New York does not exist." In *United States v. Pink*, 315 U.S. 203, 230 (1942), the Court reiterated, "It is, of course, true that even treaties with foreign nations will be carefully construed so as not to derogate from the authority and jurisdiction of the States of this nation unless clearly necessary to effectuate the national policy.... But state law must yield when it is inconsistent with, or impairs the policy or provisions of, a treaty or of an international compact or agreement.... Then, the power of a State to refuse enforcement of rights based on foreign law which runs counter to the public policy of the forum . . . must give way before the superior Federal policy evidenced by a treaty or international compact or agreement."

3. Both *Belmont* and *Pink* were reinforced by *American Insurance Association v. Garamendi*, 539 U.S. 396 (2003), where the Court reiterated, that "valid executive agreements are fit to preempt state law, just as treaties are," and that the preemptive power of an executive agreement derives from "the Constitution's allocation of the

foreign relations power to the National Government." All three cases affirm that the *Lili`uokalani assignment* preempts all laws and policies of the State of Hawai`i, and all Federal laws and policies that are "inconsistent with, or impairs the policy or provisions of, a treaty or of an international compact or agreement."

4. The Plaintiff files this suit in his private capacity as a Hawaiian subject and a third party beneficiary with enforceable rights under the 1893 *Lili`uokalani assignment*, being self-executing, and respectfully seeks declaratory and permanent injunctive relief, redress, restitution, disgorgement, and other equitable relief against Defendants for violations of the *Lili`uokalani assignment*. Plaintiff is not filing this suit in his capacity as acting Minister of the Interior.

## JURISDICTION AND VENUE

5. This case arises under the Constitution of the United States, Article VI, clause 2; U.S.C. Title 28, §1350, whereby "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States;" and an Executive Agreement (1893) between the United States and the Hawaiian Kingdom as hereinafter more fully appears.

6. Venue in the United States District Court for the District of Columbia is proper under 28 U.S.C. 1391(e), and the matter in controversy exceeds, exclusive of interests and costs, the sum of ten million dollars.

7. This Court has authority to grant declaratory relief pursuant to U.S.C. Title 28, §2201.

8. This Court has authority to grant preliminary and permanent injunctive relief, redress, restitution, disgorgement, and other equitable relief pursuant to *U.S. v. Belmont* 301

U.S. 324 (1937), *U.S. v. Pink* 315 U.S. 203 (1942), and *American Insurance Association v. Garamendi* 539 U.S. 396 (2003).

## PARTIES

9.  The Plaintiff is a Hawaiian subject and a protected person under the 1949 Geneva Convention, IV, and resides at 47-605 Puapo`o Place, Kaneohe, HI 96744.

10. Barrack Hussein Obama is President of the United States of America since January 20, 2010, hereinafter called Defendant Obama and is the successor in office to President Grover Cleveland (1893-1897). Defendant Obama is a United States citizen with an office at 1600 Pennsylvania Avenue, NW, Washington, D.C., 20500.

11. Hillary Diane Rodham Clinton is Secretary of State of the United States of America since January 21, 2009, hereinafter called Defendant Clinton and is the successor in office to Secretary of State John C. Calhoun (1844-1845) and Walter Gresham (1893-1895). Defendant Clinton is a United States citizen with an office at 2201 C Street NW, Washington, D.C., 20520.

12. Robert Michael Gates is the Secretary of Defense of the United States of America since December 18, 2006, hereinafter called Defendant Gates and is the successor in office to Secretary of the Navy John Davis Long (1897-1902) by virtue of the command structure of Unified Combatant Commands. Defendant Gates is a United States citizen with an office at 1400 Defense Pentagon, Washington, D.C., 20301-1400.

13. Robert F. Willard, Admiral, United States Navy, is the Commander of United States Pacific Command, a military component of the United States of America's Unified

4

Combatant Commands since October 19, 2009, hereinafter called Defendant Willard, and is the successor in office to Rear-Admiral J.N. Miller, Commander in Chief of the United States Naval Force on the Pacific Station (1898). Defendant Willard is a United States citizen with an office at HQ USPACOM, Attn JOO, Box 64028, Camp H.M. Smith, HI 96861-4031.

14. Linda Lingle is the Governor of the State of Hawai`i, a political component of the United States of America, since December 2, 2002, hereinafter called Defendant Lingle, and is the successor in office to Governor Benjamin Cayetano (1994-2002). Defendant Lingle is a United States citizen with an office at 415 South Beretania Street, HI 96813.

## FACTUAL ALLEGATIONS

15. On or about July 6, 1844, United States Secretary of State John C. Calhoun notified the Hawaiian government of the United States formal recognition of the Hawaiian Kingdom as an independent and sovereign State since December 19, 1842 by President John Tyler, a copy of which is annexed hereto, marked Exhibit A and made a part hereof as if set forth in full herein. As a result of said duly recognition, the United States and the Hawaiian Kingdom entered into a Treaty of Friendship, Commerce and Navigation (9 U.S. Stat. 977); Treaty of Commercial Reciprocity (19 U.S. Stat. 625); Postal Convention Concerning Money Orders (23 U.S. Stat. 736); and a Supplementary Convention to the 1875 Treaty of Commercial Reciprocity (25 U.S. Stat. 1399).

16. As a recognized State, the Hawaiian Kingdom became a full member of the Universal Postal Union in 1882, and maintained more than ninety legations and consulates throughout the world. The Hawaiian Kingdom currently has treaties with Austria-Hungary (June 18, 1875); Belgium (October 4, 1862); Bremen (March 27, 1854); Denmark (Oct. 19, 1846); France (July 17, 1839, March 26, 1846, September 8, 1858); French Tahiti (November 24, 1853); Germany (March 25, 1879); Great Britain (Nov. 13, 1836 and March 26, 1846); Great Britain's New South Wales (March 10, 1874); Hamburg (January 8, 1848); Italy (July 22, 1863); Japan (Aug. 19, 1871, January 28, 1886); Netherlands (October 16, 1862); Portugal (May 5, 1882); Russia (June 19, 1869); Samoa (March 20, 1887); Spain (October 9, 1863); Sweden and Norway (April 5, 1855); and Switzerland (July 20, 1864).

17. The Hawaiian Kingdom was also recognized as a neutral State as expressly stated in treaties with the Kingdom of Spain in 1863 and the Kingdom of Sweden and Norway in 1852. Article XXVI of the 1863 Hawaiian-Spanish treaty, for example, provides that "All vessels bearing the flag of Spain, shall, in time of war, receive every possible protection, short of active hostility, within the ports and waters of the Hawaiian Islands, and Her Majesty the Queen of Spain engages to respect, **in time of war the neutrality of the Hawaiian Islands**, and to use her good offices with all the other powers having treaties with the same, to induce them to adopt the same policy toward the said Islands (emphasis added)."

18. On or about April 10, 1877, Lili`uokalani was named heir apparent in accordance with the Hawaiian Constitution, and on or about January 29, 1891 she was sworn in as Queen of the Hawaiian Kingdom. Article 31 of the Hawaiian Constitution states,

"To the [Queen] belongs the Executive power," and in *Grieve v. Gulick*, 5 Hawai`i

73, 76 (1883), the Court stated, "the Constitution declares [Her Majesty] as the

executive power of the Government," which is the faithful execution and

administration of Hawaiian Kingdom law as distinguished from the legislative power

to enact law and the judicial power to judge law.

19. On or about January 17, 1893, Queen Lili`uokalani, by explicit grant, assigned her

executive power under threat of war to the President of the United States. The Queen

stated, "That I yield to the superior force of the United States of America whose

Minister Plenipotentiary, His Excellency John L. Stevens, has caused United States

troops to be landed at Honolulu and declared that he would support the said

Provisional Government. Now to avoid any collision of armed forces, and perhaps the

loss of life, I do this under protest, and impelled by said force yield my authority until

such time as the Government of the United States shall, upon facts being presented to

it, undo the action of its representative and reinstate me in the authority which I claim

as the constitutional sovereign of the Hawaiian Islands," a copy of the exchange of

diplomatic notes assigning Hawaiian executive power to the President and calling for

the investigation of the overthrow of the Hawaiian Kingdom government is annexed

hereto as Exhibit B (Executive Documents on Affairs in Hawaii: 1894-95, *U.S. House*

*of Representatives, 53rd Congress*) and made a part hereof as if set forth in full herein

(p. 461).

20. Her duty as constitutional monarch was to faithfully execute the laws of the Hawaiian

Kingdom by ensuring the apprehension and arrest of insurgents calling themselves a

provisional government who committed the crime of treason against the Hawaiian

Kingdom. But for the presence of U.S. troops in the aiding and protection of these insurgents, the Queen was prevented from carrying out the arrests and therefore was forced to yield, under protest, Hawaiian executive power by a temporary assignment to the President of the United States or risk bloodshed caused by the presence of U.S. troops if the insurgents were apprehended by the police force. On or about March 4, 1893, President Cleveland, predecessor in office to Defendant Obama, acknowledged receipt of this assignment and in his Message to Congress on December 18, 1893, confirmed that the Queen "surrendered not absolutely and permanently, but temporarily and conditionally until such time as the facts could be considered by the United States (Exhibit B, p. 457)."

21. On or about April 1, 1893, U.S. Special Commissioner James Blount, who arrived in Honolulu under explicit instructions by President Cleveland, initiated a Presidential investigation into the circumstances of the overthrow of the Hawaiian Kingdom government and reported his findings to Secretary of State Gresham, predecessor in office to Defendant Clinton. On or about October 18, 1893, the Secretary of State apprised the President of the conclusion of the investigation. He concluded, "The Government of Hawaii surrendered its authority under a threat of war, until such time only as the Government of the United States, upon the facts being presented to it, should reinstate the constitutional sovereign... Should not the great wrong done to a feeble but independent State by an abuse of the authority of the United States be undone by restoring the legitimate government? Anything short of that will not, I respectfully submit, satisfy the demands of justice (Exhibit B, p. 462)."

22. On or about October 18, 1893, Secretary of State Gresham, by authority of the President, directed U.S. Minister Plenipotentiary Albert Willis to initiate negotiations with Queen Lili`uokalani for settlement and restoration of the Hawaiian Kingdom government. He stated to the Minister, "You will…inform the Queen that, when reinstated, the President expects that she will pursue a magnanimous course by granting fully amnesty to all who participated in the movement against her, including persons who are, or have been, officially or otherwise, connected with the Provisional Government, depriving them of no right or privilege which they enjoyed before the so-called revolution (Exhibit B, p. 464)."

23. On or about November 13, 1893, U.S. Minister Willis met with the Queen at the U.S. Legation in Honolulu, a copy of the exchange of diplomatic notes calling for restoration of the Hawaiian Kingdom government since November 13, 1893, is annexed hereto as Exhibit C (Executive Documents on Affairs in Hawaii: 1894-95, *U.S. House of Representatives, 53rd Congress*) and made a part hereof as if set forth in full herein. Willis conveyed to the Queen the "President's sincere regret that, through the unauthorized intervention of the United States, she had been obliged to surrender her sovereignty, and his hope that, with her consent and cooperation, the wrong done to her and to her people might be redressed (Exhibit C, p. 1241)." He continued, "The President not only tenders you sympathy but wishes to help you," [and] "Should you be restored to the throne, would you grant full amnesty as to life and property to all those persons who have been or who are now in the Provisional Government, or who have been instrumental in the overthrow of your government? (*Id*.)." In this initial meeting, the Queen refused to grant amnesty and cited "Chapter

VI, section 9 of the Penal Code, as follows: Whoever shall commit the crime of treason shall suffer the punishment of death and all his property shall be confiscated to the Government (*Id.*, 1243)." The U.S. Minister notified the Secretary of State of the Queen's refusal to grant amnesty on or about November 16, 1893 by dispatch.

24. Not satisfied with the outcome of the initial meeting, Secretary State Gresham dispatched to Minister Willis on or about November 24, 1893, "The brevity and uncertainty of your telegrams are embarrassing. You will insist upon amnesty and recognition of obligations of the Provisional Government as essential conditions of restoration (Exhibit B, p. 464)." In follow-up instructions to Minister Willis on or about December 3, 1893, the Secretary of State emphatically stated "Should the Queen refuse assent to the written conditions, you will at once inform her that the President will cease interposition in her behalf, and that while he deems it his duty to endeavor to restore to the sovereign the constitutional government of the islands, his further efforts in that direction will depend upon the Queen's unqualified agreement that all obligations created by the Provisional Government in a proper course of administration shall be assumed and upon such pledges by her as will prevent the adoption of measures of proscription or punishment for what was done in the past by those setting up or supporting the Provisional Government (Exhibit B, p. 465)." Negotiations for settlement continued.

25. On or about December 18, 1893, the U.S. Minister was notified by the Queen's assistant, Joseph Carter, that she was willing to spare their lives, not, however, their property, which, "should be confiscated to the Government, and they should not be permitted to remain in the Kingdom (Exhibit C, p. 1267)." But later that day the

Queen agreed to grant "a full pardon and amnesty for their offenses, with restoration

of all rights, privileges, and immunities under the constitution and the laws which

have been made in pursuance thereof, and that I will forbid and prevent the adoption

of any measures of proscription or punishment for what has been done in the past by

those setting up or supporting the Provisional Government (Exhibit C, p. 1269)." The

U.S. Minister dispatched the Declaration to the Secretary of State on or about

December 20, 1893.

26. On or about January 12, 1894, Secretary of State Gresham acknowledged receipt of

the Queen's declaration and stated to Minister Willis that the "matter now being in

the hands of Congress the President will keep that body fully advised of the situation,

and will lay before it from time to time the reports received from you, …heretofore

withheld, and all instructions to you. In the mean time, while keeping the Department

fully informed of the course of events, you will, until further notice, consider that

your special instructions upon this subject have been fully complied with (Exhibit C,

p. 1284)." In violation of these executive agreements, President Cleveland did not

restore the Hawaiian Kingdom government, nor did he administer Hawaiian Kingdom

law. Instead, he allowed the insurgents to maintain unlawful control over the

Hawaiian Islands until his successor President McKinley entered office on March 4,

1898.

27. On or about June 16, 1897, President McKinley signed a treaty of annexation in

Washington, D.C., with these insurgents who were claiming then to be the Republic

of Hawai`i. On the very next day a diplomatic protest was filed by Joseph Heleluhe,

Secretary to the Queen, with the U.S. State Department while both were in

Washington D.C., a copy of which is annexed hereto as Exhibit D and made a part hereof as if it were set forth in full herein. Three other protests from three Patriotic Societies in Hawai`i were also filed by Mr. Heleluhe, as their Commissioner and by direction of the Queen, on or about July 24, 1897, a copy of which is annexed hereto as Exhibit E and made a part hereof as if it were set forth in full herein.  These protests relied on the settlement and agreement of restoration.

28. In willful disregard to these protests, President McKinley prepared to submit the treaty to the U.S. Senate for ratification when it would convene in December 1897. This decision prompted the three Patriotic Societies in Hawai`i, the Men and Women's Hawaiian Patriotic League (Hui Aloha `Aina) and the Hawaiian Political Association (Hui Kalai`aina), to organize a signature petition drive protesting annexation. The Patriotic League gathered 21,269 signatures and the Political Association gathered nearly 17,000 signatures, but because of concern over the wording of the Political Association's preamble, it was decided by these organizations that only the Patriotic League's petition would be filed with the U.S. Senate by the League's President, James Kaulia, a copy of which is annexed hereto as Exhibit F and made a part hereof as if it were set forth in full herein. Plaintiff's maternal great-great-great grandmother, "Kalua [Luaapana Simerson]," age 50, of Napo`opo`o, Island of Hawai`i, signed the petition (Exhibit F, p. 3); and Plaintiff's paternal great-great grandmother, "Ms. Julia [Kapapakuialii Kalaninuipoaimoku] Doiron," age 24, and her mother who is Plaintiff's paternal great-great-great grandmother, "Mrs. Lucy [Pohaialii] K. [Kaili]," age 45, both of Hanalei, Island of Kaua`i, also signed the petition (Exhibit F, p. 538).

29. By March 1898, the Senate was unable to garner enough votes for Senate ratification on account of these protests, but as a result of the Spanish American War the Congress enacted a joint resolution unilaterally annexing the Hawaiian Islands for military purposes. President McKinley signed the joint resolution into U.S. Federal law on or about July 7, 1898 (30 U.S. Stat. 750), despite the confinement of Congressional legislation to U.S. territory, and in direct violation of the *Lili`uokalani assignment*, the *Agreement of restoration* and international law.

30. On or about August 12, 1898, under orders of President McKinley, the United States militarily occupied the Hawaiian Islands during the Spanish-American War under the command of Rear-Admiral J.N. Miller, Commander in Chief of the United States Naval Force on the Pacific Station, predecessor to Defendant Willard. Rear Admiral Miller reported to Secretary of the Navy John D. Long, who under the command structure of Unified Combatant Commands is the predecessor in office to Defendant Gates of which Defendant Willard reports to. The occupation of the Hawaiian Kingdom during the Spanish-American War by the United States was also a violation of Hawai`i's international status as a neutral State.

31. The international law of occupation, which mandates an occupying military force to establish a military government to administer the laws of the occupied State, merely reinforces the 1893 *Lili`uokalani assignment* obligating the United States President and his successors in office to administer the laws of the Hawaiian Kingdom. This mandate of administering the laws of the occupied State by an occupying military government was codified under international law by virtue of Article 43 of the 1899 Hague Convention, II, *Laws and Customs of War on Land* (32 U.S. Stat. 1803),

which was later superseded by Article 43, 1907 Hague Convention, IV, *Laws and Customs on War on Land* (36 U.S. Stat. 2277). Both Hague Conventions were ratified and therefore self-executing. During the occupation, the United States failed to establish a military government to administer the laws of the Hawaiian Kingdom as mandated under both the *Lili`uokalani assignment* and the international law of occupation.

32. Since at least 1893, the United States President willfully violated the terms of the *Lili`uokalani assignment* and its obligation to restore the Hawaiian Kingdom government. Instead of administering Hawaiian Kingdom law, the United States allowed insurgents under the guise of a provisional government and later the Republic of Hawai`i to maintain unlawful control in the Hawaiian Islands. Since at least 1898, the United States willfully violated the *Lili`uokalani assignment*, *Agreement of restoration* and international law, by establishing the Territory of Hawai`i government in 1900 (31 U.S. Stat. 141), and the State of Hawai`i government in 1959 (73 U.S. Stat. 4). Adding insult to injury, and an affront to the Queen and loyal Hawaiian subjects and residents of the Hawaiian Kingdom, President McKinley appointed Sanford Dole as the first Governor for the so-called Territory of Hawai`i in 1900. Dole pardoned by the Queen because the Hawaiian executive power was not returned after the Hawaiian Kingdom government was restored in accordance with the *Agreement of restoration*. Therefore, Sanford Dole remained a fugitive of Hawaiian law throughout his life, which included his term of office as the so-called Governor of the Territory of Hawai`i.

14

33. §6 of the Hawaiian Civil Code provides that "The laws are obligatory upon all persons, whether subjects of this kingdom, or citizens or subjects of any foreign State, while within the limits of this kingdom, except so far as exception is made by the laws of nations in respect to Ambassadors or others.  The property of all such persons, while such property is within the territorial jurisdiction of this kingdom, is also subject to the laws." Since the laws are obligatory upon all persons within the Islands, irrespective of nationality, there is a corresponding duty upon the government to enforce and administer the laws of the Hawaiian Kingdom, which has been temporarily and conditionally vested with the United States President and his successors in office until the Hawaiian Kingdom government is restored and the executive power returned.

34. On or about December 10, 1995, the Plaintiff and Donald A. Lewis, both being Hawaiian subjects, formed a general partnership in compliance with an *Act to Provide for the Registration of Co-partnership Firms*, 1880, a copy of which is annexed hereto as Exhibit G and made a part hereof as if it were set forth in full herein. The partnership was named the Perfect Title Company (PTC), and functioned as a land title abstracting company, a copy of which is annexed hereto as Exhibit H and made a part hereof as if it were set forth in full herein. According to Hawaiian law, co-partnerships were required to register their articles of agreement with the Interior Department's Bureau of Conveyances, and for the Minister of the Interior, it was his duty to ensure that co-partnerships maintain their compliance with the statute. However, due to the failure of the United States to administer Hawaiian Kingdom law, there was no government, whether established by the President or a restored

Hawaiian Kingdom government *de jure*, to ensure the company's compliance with the co-partnership statute.

35. The partners of the Perfect Title Company desired to establish a legitimate co-partnership pursuant to Hawaiian Kingdom law and in order for the title company to exist as a legal co-partnership firm, the government had to be reestablished in an acting capacity, whereby an acting official is "not an appointed incumbent, but merely a *locum tenens*, who is performing the duties of an office to which he himself does not claim title (*Black's Law*, 6th ed., p. 26)." Hawaiian law did not assume that the whole of the Hawaiian government would be made vacant, and, consequently, the law did not formalize provisions for the reactivation of the government in extraordinary circumstances. Therefore, a deliberate course of action was taken to re-activate the Hawaiian government by and through its executive branch as officers *de facto* under the common law doctrine of necessity, notwithstanding the temporary assignment of executive power to the United States President.

36. The 1880 *Co-partnership Act* requires members of co-partnerships to register their articles of agreement in the Bureau of Conveyances, which is within the Interior department. The Minister of the Interior holds a seat of government as a member of the Cabinet Council, together with the other Cabinet Ministers. Article 43 of the Hawaiian Constitution provides that, "Each member of the King's Cabinet shall keep an office at the seat of Government, and shall be accountable for the conduct of his deputies and clerks." Necessity dictated that in the absence of any "deputies or clerks" of the Interior department, the partners of a registered co-partnership could assume the duty of the same because of the current state of affairs. Therefore, it was

reasonable for the partners of this registered co-partnership to assume the office of the

Registrar of the Bureau of Conveyances in the absence of the same; then assume the

office of the Minister of Interior in the absence of the same; then assume the office of

the Cabinet Council in the absence of the Minister of Foreign Affairs, the Minister of

Finance and the Attorney General; and, finally assume the office constitutionally

vested in the Cabinet as a Regency (Article 33, Hawaiian Constitution). A regency is

"the man or body of men intrusted with the vicarious government of a kingdom

during the minority, absence, insanity, or other disability of the [monarch] (*Black's

Law*, 6th ed., p. 1282)."

37. With the specific intent of assuming the "seat of Government," the partners of PTC

formed a second partnership called the Hawaiian Kingdom Trust Company (HKTC)

on December 15, 1995, a copy of which is annexed hereto as Exhibit I and made a

part hereof as if it were set forth in full herein. The partners intended that this

registered partnership would serve as a provisional surrogate for the Council of

Regency. Therefore, and in light of the ascension process explained in paragraph 36,

HKTC would serve as officers *de facto* for the Registrar of the Bureau of

Conveyances, the Minister of Interior, the Cabinet Council, and ultimately the

Council of Regency in an acting capacity by necessity.

38. Thirty-eight deeds of trusts conveyed by Hawaiian subjects and residents to HKTC

acknowledged the trust as a company acting for and on behalf of the Hawaiian

government and outlined the role of the trust company and its fiduciary duty it had to

its beneficiaries, a copy of one of the thirty-eight deeds of trust is annexed hereto as

Exhibit J and made a part hereof as if it were set forth in full herein. HKTC not only

served as officers *de facto* of the acting Cabinet Council, but also possessed a fiduciary duty toward its beneficiaries to serve as an acting government until restored *de jure* in accordance with the terms of the 1893 Agreement of restoration.

39. The purpose of the HKTC was two fold; first, to ensure PTC complies with the co-partnership statute despite the temporary assignment of executive power, and, second, to provisionally serve as the acting government of the Hawaiian Kingdom, in particular, on behalf of its beneficiaries. What became apparent was the seeming impression of a conflict of interest, whereby the duty to comply and the duty to ensure compliance was vested in the same two partners of two companies. Therefore, in order to avoid this apparent conflict of interest, the partners of both PTC and HKTC, reasoned that an *acting* Regent, having no interests in either company, should be appointed to serve as a *de facto* officer of the Hawaiian government. Since HKTC assumed to represent the interests of the Hawaiian government in an acting capacity, the trustees would therefore make the appointment.

40. In a meeting of HKTC, it was agreed that the Plaintiff would be appointed to serve as *acting* Regent, but could not retain an interest in the two companies prior to the appointment. In that meeting, it was also decided and agreed upon that Nai`a-Ulumaimalu, a Hawaiian subject, would replace the Plaintiff as trustee of HKTC and partner of PTC. The plan was to maintain the standing of the two partnerships under the co-partnership statute, and not have them lapse into sole-proprietorships. To accomplish this, the Plaintiff would relinquish his entire one-half interest by deed of conveyance in both companies to Lewis; after which Lewis would convey a redistribution of interest to Nai`a-Ulumaimalu, whereby the former would hold a

ninety-nine percent interest in the two companies and the latter a one percent interest in the same. In order to have these two transactions take place simultaneously without affecting the standing of the two partnerships, both deeds of conveyance would take place on the same day but won't take effect until the following day, February 28, 1996, a copy of both deeds are annexed hereto as Exhibit K & L and made a part hereof as if it were set forth in full herein. With the transactions completed, the Trustees then appointed the Plaintiff as *acting* Regent on or about March 1, 1996, a copy of which is annexed hereto as Exhibit M and made a part hereof as if it were set forth in full herein. Thereafter, HKTC resumed its role as a general partnership within the meaning of the 1880 Co-partnership Act, and no longer served as "a company *acting* for and on behalf of the Hawaiian Kingdom government" and prepared for the dissolution of the company.

41. On or about May 15, 1996, the Trustees conveyed by deed all of its right, title and interest acquired by thirty-eight deeds of trust to the *acting* Regent, and stipulated that the company would be dissolved in accordance with the provisions of its deed of general partnership on or about June 30, 1996, a copy of which is annexed hereto as Exhibit N and made a part hereof as if it were set forth in full herein. On or about February 28, 1997, a Proclamation by the *acting* Regent announcing the provisional restoration of the Hawaiian government was printed in the March 9, 1997 issue of the Honolulu Sunday Advertiser newspaper, A-27, a copy of which is annexed hereto as Exhibit O and made a part hereof as if it were set forth in full herein.

42. Notwithstanding the assignment of executive power to the U.S. President, the establishment of an *acting* Regent—an officer *de facto*, was a political act of self-

preservation, not revolution, and grounded upon the legal doctrine of limited necessity. Under British common law, deviations from a State's constitutional order "can be justified on grounds of necessity." See Stanley A. de Smith, *Constitutional and Administrative Law* (1986), p. 80. De Smith also states, that "State necessity has been judicially accepted in recent years as a legal justification for ostensibly unconstitutional action to fill a vacuum arising within the constitutional order [and to] this extent it has been recognized as an implied exception to the letter of the constitution." (*Id.*) In *Madzimbamuto v. Lardner-Burke* (1969), 1 A.C. 645, 732, Lord Pearce stated that there are certain limitations to the principle of necessity, "namely (a) so far as they are directed to and reasonably required for ordinary orderly running of the State, and (b) so far as they do not impair the rights of citizens under the lawful...Constitution, and (c) so far as they are not intended to and do not run contrary to the policy of the lawful sovereign." See also *Mitchell v. Director of Public Prosecutions* (1986), L.R.C. (Const) 35, 88–89; and *Chandrika Persaud v. Republic of Fiji*; and *Mokotso v. HM King Moshoeshoe II* (1989) LRC (Const) 24, 132.

43. According to Brookfield, the principle of necessity is the "power of a Head of State under a written Constitution extends by implication to executive acts, and also legislative acts taken temporarily (that is, until confirmed, varied or disallowed by the lawful Legislature) to preserve or restore the Constitution, even though the Constitution itself contains no express warrant for them." See F.M. Brookefield, "The Fiji Revolutions of 1987," *New Zealand Law Journal* (July 1988): 250, 251. And that "such powers are not dependent on the words of a particular Constitution, except in so far as that Constitution designates the authority in whom the implied powers would

be found to reside." (*Id.*) The assumption by Hawaiian subjects through the offices of

constitutional authority in government to the office of Regent, as enumerated under

Article 33 of the Constitution, was a *de facto* process born out of necessity. Cooley

defines an officer *de facto* "to be one who has the reputation of being the officer he

assumes to be, and yet is not a good officer in point of law," but rather "comes in by

claim and color of right." See Thomas M. Cooley, *A Treatise on the Law of Taxation*

(1876), 185. In *Carpenter v. Clark*, 217 Michigan 63, 71 (1921), the Court stated the

"doctrine of a *de facto* officer is said to have originated as a rule of public necessity to

prevent public mischief and protect the rights of innocent third parties who may be

interested in the acts of an assumed officer apparently clothed with authority and the

courts have sometimes gone far with delicate reasoning to sustain the rule where

threatened rights of third parties were concerned."

44. The failure of the United States to administer Hawaiian Kingdom law had a direct and

profound impact on real estate transactions in the Islands that prevented titles from

being lawfully conveyed since the overthrow of the Hawaiian Kingdom government

was settled on December 18, 1893— *Agreement of restoration*. The failure of

executing Hawaiian law also prevented native tenants from dividing out their vested

rights into fee-simple titles under the rules of the 1848 Mahele. Legal formalities

under Hawaiian statute provides that "it shall not be lawful to record any

conveyance…unless the same shall have been previously impressed with the Royal

stamp (Complied Laws of the Hawaiian Kingdom, §1254)," and in order "to entitle

any conveyance…to be recorded, it shall be acknowledged by the party or parties

executing the same, before the Registrar of Conveyances, or his agent, or some judge

of a court of record, or notary public of this Kingdom, or before some minister, commissioner or consul of the Hawaiian Islands, or some notary public or judge of a court of record in any foreign country (§1255)." In *Lenehan v. Akana*, 6 Haw. 538, 541 (1884), the Court stated if a conveyance, whether by deed or mortgage, "was not properly acknowledged it was not entitled to be recorded, and though spread upon the record it must be treated as a nullity." The failure of the United States President and his successors to administer the laws of the Hawaiian Kingdom since 1893 has prevented any lawful conveyance of real property.

45. The beneficiaries of HKTC, who were native tenants, possessed a vested right in the *dominium*,[1] and according to *Kekiekie v. Dennis*, 1 Hawai`i 69, 70 (1851), native tenant rights in the lands "were secured to them by the Constitution and laws of the Kingdom, and no power can convey them away, not even that of royalty itself." See also *Kuki`iahu v. Gill*, 1 Hawai`i 90 (1851). By virtue of these vested rights, native tenants are capable of dividing their interest in fee-simple, whenever they "shall desire such a division," (Exhibit P, p. 13, Rules #3 and #4). The only bar to this right would be a valid fee-simple title recognizable under Hawaiian Kingdom law in accordance with Mahele rule #5 (*Id.*, p. 14). Hence, current claims to fee-simple titles would have to be investigated before any beneficiary or native tenant could divide out their interest and acquire a fee-simple title. Because these rights are undivided in the entire territory of the Hawaiian Islands, a division by a native tenant could

---

[1] 1840 Constitution states "Kamehameha I, was the founder of the kingdom, and to him belonged all the land from one end of the Islands to the other, though it was not his own private property. It belonged to the chiefs and people in common, of whom Kamehameha I was the head, and had the management of the landed property."

theoretically take place anywhere within the landed territory of the Hawaiian Kingdom.

46. According to an *Act confirming certain resolutions of the King and Privy Council, passed on the 21st day of December, A.D. 1849, granting to the common people allodial titles for their own lands and house lots, and certain other privileges* (1850), a native tenant's division for his "house lot shall not exceed one quarter of an acre," and pursuant to section 4, "a certain portion of the government lands in each island shall be set apart, and placed in the hands of special agents, to be disposed of in lots of from one to fifty acres, in fee-simple, to such natives as may not be otherwise furnished with sufficient land, at a minimum price of fifty cents per acre." This Act, also known as the 1850 *Kuleana Act*, has not been repealed and continues to be the law of the land.

47. On or about February 3, 1996, the Trustees acting upon the vested rights of its beneficiaries passed a resolution announcing the quieting of all land titles in the Hawaiian Islands, and adopted six principles to aide in the investigation of claims to fee-simple titles. In order to bind PTC and its successors to the faithful performance of the "investigation and final ascertainment or rejection of all claimants of fee-simple titles," both companies entered into a covenant of agreement on or about February 6, 1996, a copy of the agreement, together with the resolution and six principles, is annexed hereto as Exhibit Q and made a part hereof as if it were set forth in full herein.

48. The announcement of the quieting of all land titles in the Hawaiian Islands was published on or about February 19, 1996, Pacific Business newspaper, p. 39, and the

23

March 1996 issue of the *Ka Wai Ola o Oha* newspaper, p. 4, copies of which are annexed hereto as Exhibits R & S and made a part hereof as if they were set forth in full herein. Claimants submitted evidence of their fee-simple titles at the office of PTC between February 14, 1996 and February 14, 1998. On or about March 1, 1996, the *acting* Regent succeeded HKTC as a party to the covenant of agreement, a copy of which is annexed hereto as Exhibit T and made a part hereof as if it were set forth in full herein. As a *de facto* representative of the original warrantor of all lands in fee-simple—the Hawaiian government, the *acting* Regent was empowered to remedy rejected claims that have been properly investigated by PTC in accordance with the abovementioned covenant of agreement.

49. On or about July 17, 1996, Carole Simafranca filed a claim with PTC to investigate the validity of their fee-simple title, and assigned claim no. 64, a copy of which is annexed hereto as Exhibit U and made a part hereof as if it were set forth in full herein.  The title report was concluded on or about August 5, 1996, and determined that the Simafranca's had no valid claim to a fee-simple title, because the fee-simple interest remained vested in James Austin, who died testate in 1894, and whose estate "remained subject to probate proceedings of a competent tribunal" under the laws of the Hawaiian Kingdom, a copy of the warranty of seisin that provided the findings of PTC's title report is annexed hereto as Exhibit V and made a part hereof as if it were set forth in full herein (p. 11).

50. Of the Simafrancas, only Carol was a native tenant and she decided to remedy her claim by dividing out her undivided interest in the *dominium* and thereby received a fee-simple title on or about November 21, 1996, by warranty deed from the Plaintiff,

in his capacity as *acting* Regent, to the same property that had been investigated, a copy of which is annexed hereto as Exhibit W and made a part hereof as if it were set forth in full herein. On or about April 10, 1996, the Plaintiff, as *acting* Regent, filed a warranty of seisin explicitly stating the covenant of warranty with the Bureau of Conveyances (Exhibit V).

51. After receiving PTC's title report, the Simafranca's approached their former escrow company, Title Guarantee of Hawai`i, to either refute PTC's report or have the title insurance policy they purchased from Title Guarantee in order to payoff the remaining balance on the loan under the Simafrancas' lender's policy. Title Guaranty did not answer the letters sent to them by the Simafrancas and the so-called foreclosure and auction continued over the protests of the Simafrancas. On or about July 26, 1996, Leroy Ujimori conveyed without title, by commissioner's deed, to Myung Soo Hwang and I Sun Hwang, husband and wife, a copy of which is annexed hereto as Exhibit X and made a part hereof as if it were set forth in full herein. The Hwang's in turn conveyed without title the property to Craig Hideki Uyehara and Sandra Ken Uyehara, husband and wife, on November 22, 1996, a copy of which is annexed hereto as Exhibit Y and made a part hereof as if it were set forth in full herein.

52. On or about September 5, 1997, the Honolulu Police arrested Lewis, the Plaintiff, and the company's secretary, Christine Chew, "for investigation of theft, racketeering and tax evasion," and seized all the company's records and computers (Exhibit Z, Honolulu Star-Bulletin, September 6, 1997, A-1). According to the Honolulu Advertiser, the "arrests were the result of a joint investigation by the state attorney

general's office and the Police Department" (Exhibit AA, Honolulu Advertiser newspaper, September 6, 1997, A-1). All three were released the same day pending further investigation. Unable to substantiate these bizarre allegations of "theft, racketeering and tax evasion," the State of Hawai`i moved to secure grand jury indictments on or about December 17, 1997, against Lewis and the Plaintiff on one count each of attempted theft in the first degree, a class B felony, a copy of which is annexed hereto as Exhibit BB and made a part hereof as if it were set forth in full herein. Also indicted were PTC clients Michael and Carol Simfranca, husband and wife, on two counts each of attempted theft in the first degree and burglary in the first degree. Benjamin Cayetano was the Governor for the State of Hawai`i and predecessor in office to Defendant Lingle.

53. The Grand Jury was convened by Dwight Nadamoto, Deputy Attorney General, representing the State of Hawai`i, and observed by Clifford Hunt, Independent counsel to the Grand Jury, and Paul Mau, Deputy Prosecuting Attorney for the City and County of Honolulu. Craig H. Uyehara, the complainant and person who claimed to own the realty in question, was an attorney for the State of Hawai`i Department of Commerce and Consumer Affairs, and Daniel Hanagami, a Lieutenant with the Honolulu Police department's white-collar crime unit, testified on behalf of the State of Hawai`i. All parties, including the complainant, were government employees of the State of Hawai`i. At the arraignment, the Plaintiff refused to enter a plea, but instead submitted a protest with the court on or about December 29, 1997, which stated in part "The court which issued the warrant for my arrest, no. 97-3082, has no legal basis and is not a competent tribunal within the meaning of Article VIII, Treaty of

1850, U.S. Statutes at Large, 43d Congress, 1873-1875, p. 408." A copy of which is annexed hereto as Exhibit CC and made a part hereof as if it were set forth in full herein.

54. As stated in the Grand Jury transcripts, Nadamoto made the Simafranca's deed from the Plaintiff, in his capacity as *acting* Regent, the subject of the attempted theft in the first degree when questioning both Craig Uyehara and Daniel Hanagami, and not a deed deriving from the Uyehara's themselves through fraud or deception, which is how the theft statute was to be used. A copy of the Grand Jury transcript is annexed hereto as Exhibit DD and made a part hereof as if it were set forth in full herein. Nadamoto also suggested to the Grand Jury that Craig Uyehara was vested with the fee-simple title when PTC did the investigation, implying it took place without his consent. The Uyehara's did not acquire their deed until November 22, 1996, well after PTC's investigation, and a day after the Plaintiff, in his capacity as *acting* Regent, conveyed the remedial deed to Carol Simafranca under her native tenant rights.

55. The indictment and prosecution violated the basic elements of what constitutes theft, which according to Cook and Markus in *Criminal Law* (1995), p. 308, "The subject of larceny at common law is personal property. Interest in real property is not included, nor objects attached to the soil, such as trees and crops, at least so long as the severance and asportation are a continuous act." Opposing and separate deeds of title to one in the same property cannot be the subject of theft, but rather agents of the real property owners themselves could have committed theft if the deeds were drawn up through fraud or deception. According to the American Law Institute's *Model*

*Penal Code and Commentaries* (Part II, 1980), p. 166, it "seems clear that a theft

prosecution should be possible where the [criminal] actor, having power as a trustee,

attorney, or otherwise to dispose of another's real estate, does so to his own benefit in

violation of his trust (*Id*.)." And that, "the inclusion of real estate within the definition

of 'property' also has the effect of extending the theft provisions to situations where

the actor secures title or other interest in real property [from the owner] by deception

or threat (*Id*.)." Neither the Plaintiff nor the Simafrancas were the Uyeharas' "trustee,

attorney, or otherwise" who secured title in real property from them "by deception or

threat." Conversely, the evidence clearly showed that it was the Uyeharas that

attempted to secure "title or other interest in real property [from the Simafrancas] by

deception or threat."

56. Lewis was acquitted, but the Plaintiff was convicted of attempted theft in the first

degree, a copy of which is annexed hereto as Exhibit EE and made a part hereof as if

it were set forth in full herein. The Simafrancas also were both convicted of attempted

theft in the first degree and attempted burglary. These convictions were rendered by a

court that lacked subject matter jurisdiction as it was neither a court of a restored

Hawaiian Kingdom government *de jure*, nor a court of a military government

established by the U.S. President under and by virtue of Article II of the U.S.

Constitution and regulated by the 1907 Hague Convention, IV, and the 1949 Geneva

Convention, IV.

## COUNT ONE

57. Plaintiff incorporates by reference all of the foregoing paragraphs.

58. In the course of failing to administer Hawaiian Kingdom law, Defendants have misrepresented the Hawaiian Islands to be a part of the domain of the United States since at least 1898 through Congressional legislation.

59. In law and in fact, the Hawaiian Islands are not the State of Hawai`i of the United States of America.

60. Therefore, Defendants misrepresentation as alleged in paragraph 58 above was, and is, false and constitutes a violation of the sovereignty of the Hawaiian Kingdom and international law.

## COUNT TWO

61. Plaintiff incorporates by reference all of the foregoing paragraphs.

62. The indictment, prosecution and conviction are egregious and malicious violations of the Plaintiff's civil rights under Article 9 of the Hawaiian Constitution (1864), which provides that "No person shall…be deprived of life, liberty, or property without due process of law."

63. Therefore, Plaintiff's arrest, prosecution and conviction is evidence of violation of the *Lili`uokalani assignment*.

## COUNT THREE

64. Plaintiff incorporates by reference all of the foregoing paragraphs.

65. On or about August 12, 1898, the United States military occupied the Hawaiian Kingdom during the Spanish-American War without the consent of the lawful authorities of the Hawaiian Kingdom and in violation of neutrality, and that the

occupation has since been prolonged. As an occupying State, the United States is regulated by international law, in particular, the 1907 Hague Convention, IV, and the 1949 Geneva Convention, IV (6 UST 3516, 75 UNTS 287), while within the territory of the Hawaiian Kingdom.

66. Under 18 U.S.C. 2441(c)(1), a war crime is "defined as grave breach in any of the international conventions signed at Geneva 12 August 1949." Article 147 of the 12 August 1949 Geneva Convention, IV, defines a grave breach as "willfully depriving a protected person of the rights of fair and regular trial."

67. Therefore, pursuant to 18 U.S.C. 2441, the Plaintiff's prosecution and conviction constitutes a war crime.

## CONTINUOUS INJURY

68. Defendants' unlawful acts, as set forth above, have caused and continue to cause substantial injury to not just the Plaintiff, but all residents and visitors across the Islands of the Hawaiian Kingdom. Absent injunctive relief by this Court, Defendants are likely to continue to injure Plaintiff, residents and visitors, reap unjust enrichment through unlawful taxation, imposts and duties, and continue to harm the public interest of the Hawaiian Kingdom.

## THIS COURT'S POWER TO GRANT RELIEF

69. *U.S. v. Belmont* (1937), *U.S. v. Pink* (1942) and *American Insurance Association v. Garamendi* (2003), empowers this Court to grant injunctive and other ancillary relief,

including punitive damages, disgorgement and restitution, to prevent and remedy any violations of the *Lili`uokalani assignment* and the international laws of occupation.

70. This Court, in the exercise of its jurisdiction, may award other ancillary relief to remedy injury caused by Defendants' law violations.

## **PRAYER FOR RELIEF**

71. WHEREFORE, Plaintiff respectfully prays that this Court:

   A.  Award Plaintiff all temporary and preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of continuous injury during pendency of this action and to preserve the possibility of effective final relief;

   B.  Preliminary and permanently enjoin Defendants from continuing to violate the *Lili`uokalani assignment*;

   C.  Enter judgment against Defendants and in favor of Plaintiff for each violation alleged in this complaint;

   D.  Award Plaintiff ten million dollars in punitive damages necessary to redress injury to Plaintiff and the reputation of his person, which includes restitution and disgorgement;

   E.  Award Plaintiff the costs of bringing this action, as well as such other and additional equitable relief as the Court may determine to be just and proper.

Dated:  May 27, 2010

Respectfully submitted,

David Keanu Sai, *pro se*

## VERIFICATION

I, David Keanu Sai, hereby state that I am the Plaintiff in this action and verify that the statements made in the foregoing COMPLAINT FOR DECLARATORY, INJUNCTIVE AND OTHER EQUITABLE RELIEF are true and correct to the best of my knowledge, information and belief.

Dated:  May 27, 2010

David Keanu Sai